C. J. Tower & Sons *v.* United States (No. 4910) [1]

---

United States Court of Customs and Patent Appeals, December 13, 1957

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt, J. Bradley Colburn,* and *Hadley S. King* of counsel) for appellant.

*George Cochran Doub,* Assistant Attorney General and *Richard E. FitzGibbon,* Chief, Customs Section for the United States.

[Oral argument October 8, 1957, by Mr. Colburn and Mr. FitzGibbon]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, C. D. 1826, sustaining the collector's classification of imported ingots composed of an alloy of approximately 88 per cent aluminum and 12 per cent silicon, together with small amounts of impurities, as aluminum silicon under paragraph 302 (j) of the Tariff Act of 1930, contrary to the importer's contention that they should be classified as an aluminum alloy under paragraph 374 of said Act.

Paragraph 302 (j):

Silicon aluminum, aluminum silicon, alsimin, ferrosilicon aluminum, ferro-aluminum silicon, 5 cents per pound.

Paragraph 374, as modified by the General Agreements on Tariff and Trade, T. D. 51802:

Aluminum, aluminum scrap, and alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:

In crude form (except scrap) _____ 2c per lb.

The merchandise is identical with that involved in Appeal No. 4722, *C. J. Tower & Sons* v. *United States,* 41 C. C. P. A. (Customs) 195, C. A. D. 550. That record has been incorporated here, and shows that we held those ingots properly classified under paragraph 302 (j) as aluminum silicon.

Appellant does not controvert that holding, but contends the additional evidence presented here establishes a commercial meaning of "aluminum silicon" so different from the common meaning as to exclude the merchandise from paragraph 302 (j). The Government

does not deny that the merchandise is an aluminum alloy in which aluminum is the component material of chief value, and would be classifiable under paragraph 374 were it not provided for in paragraph 302 (j), but states that the sole issue is:

Does the record herein establish a commercial meaning of the terms "aluminum silicon" and "silicon aluminum"?

It does not appear, however, that the Customs Court specifically passed on that question. After reviewing the evidence, the importer's contention, and several decisions of this and other courts, the court said:

Assuming *arguendo* that the trade does draw a distinction between the aluminum alloys used for castings and those used as additives or hardeners, *we are of the opinion that this is an instance where the principle of commercial designation, which is a rule of construction, must yield if the intent of Congress be otherwise expressed.* (Italics ours.)

The court then concluded:

Applying the doctrine of the cases above discussed, we are of the opinion that the provisions of paragraph 302 are to be read and applied in accordance with their common and popular signification.

As we understand the quoted language, the court held that a commercial meaning of "aluminum silicon" distinct from the common meaning could not, even if established, control the classification of the instant merchandise. Accordingly, that holding must be considered first since, if it is correct, the question whether commercial meaning has been established becomes moot.

In reaching its conclusion that a showing of commercial meaning would not be in order, the Customs Court appears to have relied heavily on our decision in the incorporated case, from which it quoted the following excerpt:

It is clear to us from a reading of the statute that Congress intended that the involved merchandise should be classified as "aluminum silicon." The provision for that material is clear and unambiguous and not restricted by use or any other qualification.

Apparently the Customs Court construed the above to preclude application of the commercial meaning doctrine. While that language, standing alone, might be susceptible of such interpretation, we respectfully suggest the decision as a whole does not support that conclusion. It should be noted that we also said:

It is well understood by those familiar with customs law that tariff acts are drawn in the language of commerce, which is presumptively that in common use, and not in terms of science * * *.

*In the present case the record is barren of any evidence which even squints at establishing the commercial meaning of "aluminum silicon," which differs from its common meaning.* (Italics ours.)

While the merchandise there was the same as that at bar, the evidence was not the same. It would seem, therefore, by specifically

pointing out that "tariff acts are drawn in the language of commerce," and that no evidence of commercial meaning had been presented, the importer was virtually invited to establish such a meaning if there were one.

The Customs Court cited other decisions in support of its holding that the term "Aluminum silicon" must be read in accordance with its common meaning. Those decisions support the doctrine that commercial meaning must yield to common meaning if it is clear Congress so intended. Here, however, we find no evidence of such intention. There is nothing to show that, with respect to paragraph 302 (j), Congress intended to depart from the general rule of commercial meaning. Indeed, in *United States* v. *C. J. Tower & Sons*, 40 C. C. P. A. (Customs) 14, C. A. D. 491, this court accepted, as controlling classification, the commercial meaning of the term "alloys" in paragraph 302 (o) differing from the common meaning. Clearly, therefore, the holding of the Customs Court that "the provisions of paragraph 302 are to be read and applied in accordance with their common and popular signification, regardless of proof," is not in order.

It is suggested in the Government's brief that the Customs Court's holding that a showing of commercial meaning is not in order should be read as applying to paragraph 302 (j) only; but there is nothing to show that Congress intended a distinction between subparagraphs 302 (j) and 302 (o) with respect to commercial meaning.

For the reasons given, we think the instant case is a proper one for the presentation of evidence to establish a commercial meaning of "aluminum silicon" and "silicon aluminum" differing from their common meaning. It remains to be determined whether the evidence presented is sufficient for that purpose.

As above noted, the merchandise is an alloy of approximately 88 per cent aluminum and 12 per cent silicon. It has a relatively fine and uniform grain structure, and may be machined and adapted to various uses. The importer introduced two pieces of metal, one consisting of 50 per cent each of aluminum and silicon, and the other 75 per cent aluminum and 25 per cent silicon, each of which has a comparatively coarse grain structure. The testimony shows they are brittle and not machinable, and useful only as additives in the production of aluminum alloys.

It is appellant's position that the terms "aluminum silicon" and "silicon aluminum" refer in commercial use only to products which contain a minimum of approximately 25 per cent silicon, and that, in such use, a machinable alloy such as the instant merchandise consisting of 88 per cent aluminum and 12 per cent silicon would not be considered as coming within either of those terms.

The Government contends that the evidence here does not satisfy the standard set up in *Passaic Worsted Co. et al.* v. *United States*, 17

C. C. P. A. (Customs) 459, T. D. 43916. In that case the Government failed to establish a commercial meaning of the words "textile machinery." Here, however, the importer is not trying to show the precise commercial meaning of the terms "aluminum silicon" and "silicon aluminum," but merely to show that the commercial meaning does not include the instant merchandise. It is to be noted the parties agree that if this merchandise does not belong in paragraph 302 (j), it is classifiable in paragraph 374.

The testimony is to the effect that the terms "aluminum silicon" and "silicon aluminum" are commonly used interchangeably, therefore no distinction need be made between those terms in the following discussion.

To support its position, appellant presented six witnesses closely identified with the wholesale aluminum and aluminum alloy industry and whose collective experience appears to cover the entire United States. Their testimony is to the effect that the two products most commonly known as aluminum silicon or silicon aluminum are those containing fifty per cent each of aluminum and silicon, and those containing seventy-five per cent aluminum and twenty-five per cent silicon. The witnesses were not in complete accord whether those products could properly be called alloys, but in our opinion that question is not material since paragraph 302 (j), under which such products are agreed to be classifiable, is not limited to alloys. However, the witnesses did agree that the terms "aluminum silicon" and "silicon aluminum" had a definite commercial meaning limiting them to mixtures containing an approximate minimum of twenty-five per cent silicon.

While difference in use is not necessarily controlling, it is clear the 88-12 ingot is so distinct in physical properties and utility from the 50-50 and 75-25 per cent mixtures of silicon and aluminum that different names might well be applied to them. The testimony of the witnesses supports that conclusion. No doubt, as we held in the earlier C. J. Tower & Sons case, the common meaning of "aluminum silicon" is broad enough to include the instant merchandise, but the testimony shows that a narrower meaning prevails in commercial usage.

In the Government's brief it is pointed out that statements were made by some of the witnesses to the effect that the percentages of silicon and aluminum in aluminum silicon might be varied as desired. Those statements, however, when taken in context appear to apply only to mixtures which contain at least twenty-five per cent of silicon. The witnesses testified unequivocally that alloys containing no more than twelve per cent of silicon would not be regarded as aluminum silicon in the commercial meaning of that term.

It is further asserted in the Government's brief that appellant should have produced actual evidence as to how the imported merchandise was bought and sold rather than opinions of qualified persons. While evidence of that type would be desirable, we do not consider it essential. In the *Passaic Worsted Co. et al.* case the court pointed out that after it had been "legally admitted" that there was a commercial designation differing from the common meaning

\* \* \* the next inquiry must be: "By what name are these articles designated uniformly, generally, and definitely in the trade wherever they are bought and sold?" If, to such an inquiry, the witness can respond that they are so designated as textile machinery, the evidence is competent and tends to prove commercial designation.

The quoted matter shows that opinion evidence may be competent on the issue of commercial designation. (Also see *United States* v. *C. J. Tower & Sons*, 40 C. C. P. A. (Customs) 14, C. A. D. 491.) Moreover, the Government did not offer evidence to rebut that testimony.

Under the facts here, we think the evidence establishes a commercial meaning such as to exclude the instant merchandise from paragraph 302 (j). Accordingly, it becomes necessary to *reverse* the judgment of the Customs Court and *remand* the cause for further proceedings consistent with the views expressed herein.

Jackson, J., Retired, recalled to participate.